USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/25/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Christopher J. Ivanov,

                                  Plaintiff,

              -against-

Kilolo Kijakazi,[1]

                                  Defendant.

21-cv-05946 (SDA)

<u>OPINION AND ORDER</u>

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Christopher J. Ivanov ("Ivanov" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied his application for Disability Insurance Benefits ("DIB"). (Compl., ECF No. 1.) Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings.[2] (Pl.'s Mot., ECF No. 8; Comm'r Not. of Mot., ECF No. 12.)

For the reasons set forth below, Plaintiff's motion is GRANTED, the Commissioner's motion is DENIED and this action is remanded for further administrative proceedings.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security, succeeding Acting Commissioner Andrew Saul. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court has substituted Kilolo Kijakazi in the caption in place of Andrew Saul. No further action need be taken to continue this suit. *See* 42 U.S.C. § 405(g).

[2] The Court notes that Plaintiff's motion is denominated as a "Motion for Summary Judgment." (*See* Pl.'s Mot.) However, under the Standing Order in effect at the time this action was commenced, Plaintiff was to file a motion for judgment on the pleadings. (*See* Standing Order, ECF No. 4.) Thus, the Court construes Plaintiff's motion as a motion for judgment on the pleadings.

**BACKGROUND**

I.    **Procedural Background**

On August 11, 2015, Ivanov filed an application for DIB, with an alleged disability onset date of December 24, 2014. (Administrative R., ECF No. 7 ("R."), 399.) The Social Security Administration ("SSA") denied his application on or about October 7, 2015, and, thereafter, Ivanov filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (R. 253, 258, 279, 285-86.) On October 30, 2017, Ivanov appeared for a hearing before ALJ Lynn Neugebauer. (R. 183-218.) Ivanov was represented at the hearing by attorney Cyrus Shaw. (R. 183.)

In a decision dated March 28, 2018, ALJ Neugebauer found Ivanov not disabled. (R. 266.) Ivanov filed an informal request for review of the ALJ decision from the Appeals Council. (R. 362.) On March 26, 2019, the Appeals Council vacated the March 28, 2018 hearing decision and remanded the case to an ALJ for two reasons: (1) the March 28, 2018 decision's residual functional capacity ("RFC") assessment was for a reduced range of sedentary, but the jobs cited were performed at the light level; and (2) the decision considered December 31, 2016 as the claimant's date last insured[3] ("DLI"), but information following the decision revealed that the claimant's DLI was December 31, 2018. (R. 272.) The Appeals Council directed the ALJ, on remand, to further consider Ivanov's maximum RFC and his DLI. (R. 272-73.)

On September 6, 2019, Ivanov appeared for a hearing before ALJ Alexander Levine. (R. 219-45.) Ivanov was represented at the hearing by attorney Carmen Hamza. (R. 219.) In a decision

---

[3] To qualify for disability insurance benefits, a claimant must be both disabled and insured for benefits. 42 U.S.C. § 423(a)(1)(A), (c); 20 C.F.R. §§ 404.101, 404.120 & 404.315(a). The last date a person meets these requirements is commonly referred to as the date last insured.

dated December 10, 2019, ALJ Levine found Ivanov not disabled. (R. 153-74.) On January 10, 2020, Ivanov requested review of the December 10, 2019 ALJ decision from the Appeals Council. (R. 395-98.) His request was denied on May 6, 2021, making ALJ Levine's decision the Commissioner's final decision. (R. 1-7.) This action followed.

## II.     Non-Medical Evidence

Born on August 28, 1974, Ivanov was 40 years old on the alleged onset date and 44 years old on the DLI. (*See* R. 2, 8.) Ivanov has a high school education. (R. 457.) From May 1996 until October 2013, Ivanov worked as a stagehand for the Metropolitan Opera Association. (R. 252, 896.) As a stagehand, he would breakdown, move, ship and store sets, which required him to lift stage parts and props that weighed 100 pounds or more. (R. 226-27, 458.)

## III.    Medical Evidence Before The ALJ[4]

### A.     Medical Evidence Prior To The Alleged Onset Date

On April 26, 2005, Ivanov sustained an injury to his neck at work when a piece of scenery fell from around 27 feet, striking him in the head. (R. 9, 17, 23, 37, 614.) On November 19, 2009, Ivanov sustained an injury to his right knee when a dolly struck his knee while he was moving scenery at work. (R. 100, 614.) Thereafter, on or about November 25, 2009, Ivanov began treating with orthopedic surgeon, Louis Rose, M.D. who he saw approximately once per month. (R. 699-713.) On April 22, 2010, Dr. Rose conducted an arthroscopic medial and lateral meniscectomy, synovectomy and chondroplasty of the patella on Ivanov's right knee.[5] (R. 872-73.) Dr. Rose's

---

[4] The Court focuses on the medical evidence between the alleged onset date, December 24, 2014, and Ivanov's DLI, December 31, 2018. (R. 272-73.)

[5] "Arthroscopic meniscectomy is an outpatient minimally invasive surgical procedure used to treat a torn meniscus cartilage in the knee. . . . Only the torn segment of the meniscus is removed." *Meniscectomy: Arthroscopic Meniscectomy-Minimally Invasive Arthroscopic Surgery for Torn Meniscus Cartilage in the*

postoperative diagnosis was tear of the right-knee medial meniscus, tear of the right-knee lateral meniscus, right synovitis and right chondromalacia of the patella. (R. 872.) Between April 2010 and March 2012, Ivanov continued to see Dr. Rose approximately once every six weeks. (R. 714-91.)

On April 19, 2012, Dr. Rose conducted an arthroscopic medial and lateral meniscectomy, synovectomy, chondroplasty of the medial femoral condyle and patella, and arthroscopic removal of loose body on Ivanov's right knee. (R. 876-77.) Dr. Rose's postoperative diagnosis was tear of the right-knee medial meniscus, tear of the right-knee lateral meniscus, right synovitis, right chondromalacia of the patella and medial femoral condyle and loose body. (R. 876.) Thereafter, Ivanov continued to see Dr. Rose approximately once every six weeks through September 2013. (R. 792-842.)

On October 24, 2013, Ivanov sustained another injury to his right knee while at work when he "had to kick/push a 4x8 box" while building a set and subsequently experienced severe pain in his right knee. (R. 82.) After seeing Dr. Rose for several follow-up appointments (R. 843-49), on December 27, 2013, Ivanov had a magnetic resonance imaging ("MRI") of his right knee by Dr. John T. Rigney, M.D. of Distinguished Diagnostic Imaging, P.C., on referral from Dr. Rose. (R. 586, 878-79.) The MRI indicated degenerative changes, a joint effusion, marked soft tissue edema, injury of the anterior cruciate ligament and tear of the lateral meniscus at the junction between the anterior horn and body. (*Id.*)

---

*Knee*, UW Medicine: Orthopaedics and Sports Medicine, https://orthop.washington.edu/patient-care/articles/sports/meniscectomy.html (last visited Mar. 25, 2023). "A synovectomy is an excision of synovial membrane, such as that lining the capsule of the knee joint." *Dorland's Illustrated Medical Dictionary* 1826 (33d ed. 2020). Chondroplasty is "[r]eparative surgery of cartilage." *Stedmans Medical Dictionary* 172080 (Westlaw database updated Nov. 2014).

Ivanov continued to treat with Dr. Rose, seeing him approximately once every six weeks for follow-up treatment through December 2014. (R. 556-571, 589-95, 604-05, 850-62.) On December 10, 2014, Dr. Rose noted that Ivanov had been treating with his practice for the October 2013 injury and that based on the December 2013 MRI documenting a meniscal tear, he was requesting that Ivanov undergo a repeat arthroscopy of the right knee and was awaiting authorization for the surgery. (R. 570-71.)

**B.    March 2015 Through September 2015 Treatment Records**

Ivanov saw Dr. Rose for a follow-up visit on March 16, 2015. (R. 572-74, 596.) Ivanov reported intermittent right-knee pain at level 7 out of 10. (R. 572.) Ivanov stated that his heating pad and pain medications only helped slightly. (*Id*.) Ivanov further reported that his symptoms were exacerbated through activity, exertion, arising from a sitting position, lifting objects, pivoting, pressure to the area, pulling, pushing, squatting, twisting motions, extension, carrying, change in weather, cold weather, damp weather, using stairs and prolonged standing. (*Id*.) Dr. Rose noted stability to varus and valgus stress,[6] marked tenderness at the medial and lateral joint lines, patellofemoral crepitus[7] and positive McMurray's test[8] with medial and lateral joint line pain. (R. 573.) Ivanov's right-knee range of motion was 110 degrees at flexion with pain and

---

[6] "Varus and valgus stress tests result in the evaluation of the stability of the medial and lateral collateral ligaments of the knee (MCL) (LCL) and are performed by placing force on the joint." *Julie A. v. Comm'r of Soc. Sec.*, No. 20-CV-01237 (ATB), 2022 WL 813901, at *13 (N.D.N.Y. Mar. 17, 2022) (citation omitted).

[7] Joint crepitus is "the grating sensation caused by the rubbing together of the dry synovial surfaces of joints." *Dorland's Illustrated Medical Dictionary* 424 (33d ed. 2020).

[8] "A McMurray's test is used to diagnose a torn meniscus." *Dolan v. Berryhill*, No. 17-CV-04202 (GBD) (HBP), 2018 WL 4658804, at *5 n.11 (S.D.N.Y. July 24, 2018), *report and recommendation adopted*, 2018 WL 3991496, at *5 n.12 (S.D.N.Y. Aug. 21, 2018) (citing *Dorland's Illustrated Medical Dictionary* 1894 (32d ed. 2012).

stiffness and zero degrees at extension.  (*Id*.) Dr. Rose assessed a lateral meniscus tear, a possible

medial meniscus tear and discussed treatment alternatives. (*Id*.) Dr. Rose advised Ivanov to use

a heating pad and elevate the extremity above heart level. (*Id*.) He also instructed Ivanov not to

ambulate on uneven and slippery surfaces or perform kneeling or squatting activities. (*Id*.) Dr.

Rose noted that Ivanov should continue taking his medications as prescribed and that he would

perform a right-knee arthroscopy when Ivanov was medically cleared. (R. 573-74.)

On May 26, 2015, Ivanov saw Mark Kramer, M.D. of MES Solutions for an independent

medical examination at the direction of the New York State Worker's Compensation Board. (R.

889-93.) Dr. Kramer noted that Ivanov had received authorization for arthroscopic surgery on his

right knee but had not been able to obtain medical clearance and would proceed with surgery if,

on retesting, his diabetes was under control. (R. 892.) Ivanov complained of pain, swelling,

difficulty walking and difficulty going up and down stairs. (*Id*.) He also reported that he felt there

was something floating in his knee and that he had chronic pain and intermittent acute pain when

straightening and bending his knee. (*Id*.) On physical examination, Dr. Kramer found that Ivanov

ambulated slowly with "a shuffling type gait pattern;" was able to stand on his toes and heels;

was able to squat "somewhat" and had swelling in both legs. (R. 893.) Dr. Kramer noted that

Ivanov's right knee was stable with varus and valgus stress and that Ivanov could extend his right

knee fully and flex greater than 90 degrees, but his body habitus[9] prevented him from flexing

---

[9] "Body size and habitus describe the physical characteristics of an individual and include such considerations as physique, general bearing, and body build." *See* Body Size And Habitus, National Library of Medicine PubMed, https://pubmed.ncbi.nlm.nih.gov/21250087/ (last visited March 17, 2023); *see also Butler v. Colvin*, No. 14-CV-02325 (SN), 2015 WL 3606278, at *11 (S.D.N.Y. June 8, 2015) (describing body habitus as body shape).

further. (*Id*.) Based on those measurements, Ivanov's right-knee range of motion decreased from 110 degrees at his last visit with Dr. Rose to 90 degrees at this visit. (R. 573, 893.)

On June 19, 2015, Ivanov saw his primary care doctor, Frank Pintauro, M.D. for a preoperative medical assessment. (R. 622-23, 628.) Dr. Pintauro assessed Ivanov's diabetes, uncomplicated, type II; benign hypertension, which he found controlled on his current medications; and morbid obesity. (R. 624.) He also noted that Ivanov was "medically optimized for arthroscopy of the knee." (*Id*.)

On July 7, 2015, Ivanov reported to Dr. Rose that his intermittent right-knee pain remained at 7 out of 10. (R. 575-77, 597.) Ivanov's right-knee range of motion increased since his prior visit with Dr. Kramer, from 90 to 110 degrees. (R. 576, 893.) Dr. Rose noted that Ivanov walked with an antalgic gait, affecting the right lower extremity. (*Id*.) Dr. Rose further noted that the lateral meniscal tear was worsening. (*Id*.) Dr. Rose reiterated his instructions to use a heating pad, elevate the extremity and not ambulate on uneven and slippery surfaces or perform kneeling or squatting activities. (*Id*.)

On July 9, 2015, Dr. Rose and physician assistant Adam Romanek conducted a knee arthroscopy on Ivanov's right knee. (R. 587-88.) During a postoperative visit on July 15, 2015, Ivanov reported intermittent, minor pain with moderate joint pain. (R. 578-79, 599.) Dr. Rose noted that there was mild swelling and that the arthroscopic portals were healing. (R. 599.) He further noted that there was stability to varus and valgus stress and marked tenderness at the medial and lateral joint lines. (*Id*.)

On July 22, 2015, Ivanov saw Dr. Rose for an additional postoperative visit regarding his right knee. (R. 580-82, 600-01.) Ivanov reported intermittent, moderate right-knee pain. (R. 580.)

Dr. Rose provided wound care and dressing changes. (*Id*.) Ivanov's right-knee range of motion at flexion decreased from 110 degrees prior to the operation to 100 degrees following the operation. (R. 576, 581.) His right-knee extension remained the same. (*Id*.) Dr. Rose prescribed treatment, including hot and cold packs, electrical stimulation/TENS and physical therapy 2 to 3 times a week. (R. 581-82, 600.)

Ivanov saw Dr. Rose for a follow-up visit on September 2, 2015. (R. 583-85, 602-03.) Ivanov reported intermittent right-knee pain at level 3 to 4 out of 10. (R. 583.) Dr. Rose noted that Ivanov's symptoms were unchanged and that his twice weekly physical therapy had helped. (*Id*.) Ivanov's right-knee range of motion remained the same as his last visit, and his arthroscopic portals were well-healed. (R. 584.) Dr. Rose requested authorization for weekly Orthovisc[10] injections over the span of five weeks and advised Ivanov to continue his current treatment and physical therapy. (R. 584, 602.)

### C.     September 30, 2015 Consultative Examination – Dr. Carol McLean-Long, M.D.

On September 30, 2015, Ivanov saw Carol McLean-Long, M.D. for an internal medicine consultative examination. (R. 614-20.) Dr. McLean-Long noted Ivanov's chief complaints as high blood pressure, type 2 diabetes mellitus, dry eyes, bad knees, headache, neck pain and being overweight. (R. 614.)  On examination, Dr. McLean-Long found that Ivanov appeared to be in no acute distress. (R. 616.) His gait was slow and hesitant, and he had difficulty walking on his heels and toes. (*Id.*) Ivanov's stance was normal and wide, and he could squat one fourth of the way

---

[10] "Orthovisc is a solution of sodium hyaluronate, a thick (viscous) substance that is naturally present in the knee joint . . . injected to relieve pain from osteoarthritis." *Juarez v. Kijakazi*, No. 20-CV-09542 (SDA), 2022 WL 3656313, at *5 (S.D.N.Y. Aug. 25, 2022) (citation omitted). Orthovisc is a type of viscosupplementation. (*See* n.14, *infra*.)

holding on. (*Id.*) Ivanov required no assistive devices or assistance during the examination, as he was able to rise from a chair without difficulty, needed no help changing for the exam and used the table to get on and off the exam table. (*Id.*)

In Dr. McLean-Long's examination of Ivanov's musculoskeletal condition, she noted that Ivanov's cervical spine had full flexion, extension, lateral flexion bilaterally and rotary movement bilaterally. (R. 617.) His lumbosacral spine had full lateral flexion bilaterally and rotary movement bilaterally, although it showed flexion and extension at approximately 30 degrees. (*Id.*)  Dr. McLean-Long further noted that the flexion and extension of Ivanov's hips were 90 degrees bilaterally and of the knees 110 degrees bilaterally. (*Id.*) Otherwise, Ivanov had full range of motion regarding his wrists, shoulders, elbows, hips, knees and ankles bilaterally. (*Id.*) Ivanov underwent the Straight Leg Raise test, which showed negative bilaterally. (*Id.*) His joints appeared to be stable and nontender. (*Id.*) In her neurologic examination, Dr. McLean-Long found that Ivanov exhibited no sensory deficit and had strength 4/5 in the upper and lower extremities. (*Id.*)

For diagnoses, Dr. McLean-Long listed history of multiple traumas with neck pain; knee pain bilaterally, status post knee surgery; diabetes; high blood pressure; dry eyes; headaches; and overweight. (R. 618.) She noted that Ivanov's prognosis was fair. (*Id.*) Dr. McLean-Long opined that Ivanov had a mild to moderate limitation in his ability to sit, stand, climb, push, pull and carry heavy objects. (*Id.*)

### D.    December 2015 Through December 2018 Treatment Records

On December 3, 2015, Ivanov saw Dr. Robert Y. Pick, M.D. for an independent medical examination at the direction of the New York State Worker's Compensation Board. (R. 896-902.) During the exam, Ivanov stated that he felt "'mostly' better now, compared to when he started

treatments," but was "not 100%." (R. 897, 902.) Ivanov reported that he had pain of 4 to 5 out of 10 and that his right-knee pain was achy, sharp and nagging with pain radiating to the knee cap. (*Id*.) He further reported that he could walk "several" city blocks; had difficulty with stairs; could sit for 1 to 2 hours before getting stiff; and exacerbated knee-pain when climbing stairs, kneeling and arising from kneeling. (R. 902.)  On examination, Dr. Pick found tenderness, effusion and diminished range of motion in the right knee. (R. 898.) Dr. Pick diagnosed Ivanov with right-knee strain/sprain/symptomatic aggravation of underlying pre-existing degenerative joint disease, status post arthroscopy. (*Id*.) For treatment, Dr. Pick endorsed a series of three Synvisc[11] injections to the right knee and physical therapy 3 times per week for 6 weeks.  (*Id*.)

Ivanov saw Dr. Pintauro for a routine medical visit on January 13, 2016. (R. 688.) Dr. Pintauro noted that Ivanov had restarted physical therapy the prior week. (*Id*.) Following his visit, Dr. Pintauro referred Ivanov to an endocrinologist regarding his uncontrolled diabetes. (*Id*.)

On June 27, 2016, Ivanov saw Bradley D. Wiener, M.D., at Middletown Medical Urgent Care, P.C. for an independent medical evaluation in connection with his worker's compensation claims. (R. 906-09.) Ivanov reported swelling and discomfort within his right knee, which he attempted to treat with a home exercise program and Advil on an as-needed basis. (R. 907.) In his physical examination, Dr. Wiener noted that Ivanov was 6' 3'' tall and 425 pounds. (*Id*.) Ivanov's right knee demonstrated significant venous stasis disease along the lower extremity with pitting edema. (*Id*.) Dr. Wiener also noted that the range of motion of flexion was 90 degrees

---

[11] "'Synvisc' is a natural substance that is injected directly into the knee to lubricate and cushion the joint in order to provide relief from osteoarthritis knee pain." *Archambault v. Astrue*, No. 09-CV-06363 (RJS) (MHD), 2010 WL 5829378, at *4 (S.D.N.Y. Dec. 13, 2010), *report and recommendation adopted*, 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011) (citation omitted). Synvisc is a type of viscosupplementation. (*See* n.14, *infra*.)

with mild tenderness on palpation along the medial and lateral joint lines, with no evidence of laxity on stress testing of the knee in varus or valgus positions. (*Id.*) Dr. Wiener diagnosed Ivanov with a right-knee sprain with exacerbation of pre-existing internal derangement[12] and pre-existing degenerative arthropathy status post-surgical intervention. (R. 908.) Dr. Weiner also opined that Ivanov demonstrated a 57.5% loss of use of the right leg. (R. 909.) For treatment, Dr. Wiener noted that continued viscosupplementation injections[13] were warranted and that Ivanov did not require active orthopedic treatment because he appeared to have reached maximum medical improvement for purposes of workers' compensation. (R. 908-909.)

On August 25, 2016, Ivanov saw Brian Haftel, M.D. at Multi-Specialty Pain Management, P.C. on referral from Dr. Rose. (R. 648-51.) Ivanov reported that his worst area of pain was in his neck, which was aching, sharp and constant. (R. 648.) He reported radiation of pain from his shoulders to his hands and fingertips and mild weakness in his hands, causing him to drop items involuntarily. (*Id.*) Ivanov mentioned having tightness and stiffness of the cervical region, occasional headaches and dizziness and constant aching in his right shoulder. (*Id.*) Dr. Haftel noted that Ivanov had intermittent limited range of motion and occasional clicking and popping from the shoulder joint. (*Id.*) Ivanov's reflexes in the upper extremities and motor functions in the upper extremities were intact, and atrophy was not present. (R. 649.) Dr. Haftel noted that Ivanov had diminished range of motion in the cervical spine with flexion of 25 degrees to 60

---

[12] "Internal knee derangement is the partial dislocation of the knee joint" that "is typically marked by significant pain and spasm of the muscles surrounding the joint." *Dolan*, 2018 WL 4658804, at *3 n.8 (citing *Dorland's Illustrated Medical Dictionary*, 493 (32d ed. 2012).

[13] Viscosupplementation treatment for osteoarthritis is when hyaluronic acid that serves as a lubricant and shock absorber for a joint's cartilage cap is replaced by injection. *See* Viscosupplementation Treatment for Arthritis, Johns Hopkins, https://www.hopkinsmedicine.org/health/conditions-and-diseases/arthritis/viscosupplementation-treatment-for-arthritis (last visited Mar. 25, 2023).

degrees, extension of 35 degrees to 50 degrees and rotation of 50 degrees to 80 degrees. (*Id.*) Dr. Haftel also noted tenderness and spasm in the bilateral paracervical and trapezius, with tenderness over the lesser and greater occipital nerves, bilateral parathoracic tenderness with palpable spasms noted in the interscapular region and midline tenderness. (R. 649-50.)

Upon examination of Ivanov's right shoulder, Dr. Haftel noted that the range of motion was diminished with abduction and flexion of 140 to 180 degrees, with tenderness over the acromioclavicular joint and anterolateral shoulder and internal and external rotation diminished to 60 to 90 degrees secondary to pain. (R. 650.) Dr. Haftel's impressions were that there was a cervical strain, cervical radiculopathy and a right-shoulder strain/sprain. (*Id.*) Dr. Haftel noted that "due to ongoing symptomatology and the fact that [Ivanov's] neurological status ha[d] deteriorated," he was scheduling Ivanov for an EMG/NCV[14] examination of upper extremities. (R. 650.) He advised Ivanov to continue therapy and scheduled an MRI of his cervical spine without contrast. (*Id.*)

On September 22, 2016, Ivanov saw Dr. Haftel for a follow-up visit regarding his neck and right shoulder. (R. 652-54.) Ivanov reported the same general symptoms as his prior visit. (R. 652.) Ivanov reported that he had an EMG exam done and the results were pending, but the MRI was not able to be performed due to his weight. (*Id.*) On sensory exam of the upper extremities, Dr. Haftel found diminished range of motion with flexion of 40 degrees to 60 degrees, extension of 30 degrees to 50 degrees and rotation of 50 degrees to 80 degrees. (R. 653.) On cervical exam, Dr. Haftel noted bilateral paracervical and trapezius tenderness and spasm, as well as tenderness

---

[14] "EMG is a procedure used to assess muscles and nerve cells that control them." *Laureano v. Comm'r of Soc. Sec.*, No. 17-CV-01347 (SDA), 2018 WL 4629125, at *6 n.13 (S.D.N.Y. Sept. 26, 2018) (citation omitted). "A NCV test is often used to distinguish between a nerve disorder and a muscle disorder." *Id.*

over the lesser and greater occipital nerves and midline tenderness at C7.[15] (*Id.*) A Spurling's test was positive.[16] (*Id.*) In a right shoulder exam, Dr. Haftel found that the range of motion was diminished with abduction and flexion of 145 to 180 degrees. (R. 654.) Dr. Haftel prescribed Naproxen and Cyclobenzaprine and advised Ivanov to continue therapy and avoid driving and operating machinery as the medication could cause impairment. (*Id.*)

On November 17, 2016, Ivanov saw Farhana Ahmed, D.O. at Multi-Specialty Pain Management, P.C. for a follow-up examination regarding his neck and right shoulder. (R. 655-57.) Dr. Ahmed's cervical exam found diminished range of motion at flexion and extension. (R. 656.) Dr. Ahmed also noted bilateral paracervical and trapezius tenderness and spasm, tenderness over the lesser and greater occipital nerves and midline tenderness at C7. (*Id.*) A Spurling's test was positive. (*Id.*) Dr. Ahmed's right shoulder exam found that the range of motion was diminished with abduction and flexion to 160 to 180 degrees. (R. 657.) There was tenderness over the acromioclavicular joint and anterolateral shoulder and internal and external rotation was diminished to 65 to 90 degrees secondary to pain on extremes of motion. (*Id.*) Dr. Ahmed recommended cervical trigger point injections,[17] since Ivanov had been suffering chronic neck pain without much improvement with a physical therapy program and medications. (*Id.*)

---

[15] "The cervical spine consists of the spinal area from the base of an individual's skull to the thoracic vertebrae, and is comprised of seven vertebrae that are numbered C1-C7." *Zellner v. Colvin*, No. 13-CV-0432A(F), 2016 WL 11481728, at *2 n.7 (W.D.N.Y. Mar. 22, 2016), *report and recommendation adopted*, 2016 WL 1741368 (W.D.N.Y. May 3, 2016).

[16] A Spurling's test enables a doctor to see if compressing the cervical spine can reproduce or (temporarily) worsen a patient's radicular symptoms. *See Arzu v. Saul*, No. 19-CV-06451 (VSB) (BCM), 2020 WL 9596205, at *4 n.7 (S.D.N.Y. Nov. 20, 2020), *report and recommendation* adopted, 2021 WL 1947290 (S.D.N.Y. May 12, 2021) (citation omitted). "If Spurling's test reproduces the patient's radicular symptoms, cervical radiculopathy is likely present." *Id.*

[17] "Trigger point injections are injections intended to deactivate trigger points (discrete spots in a taut band of skeletal muscle) and provide pain relief." *Bailey v. Colvin*, No. 15-CV-09287 (LTS) (RLE), 2016 WL

On December 15, 2016, Ivanov had a follow-up examination with Dr. Ahmed with respect to his neck pain. (R. 658-60.) Ivanov continued to report constant neck pain and an aching sensation with radiation of pain to his bilateral upper extremities. (R. 658.) He continued to have stiffness and tightness of the cervical region and intermittent headaches. (*Id.*) Ivanov was managing the pain with Naproxen, Lidocaine cream and Cyclobenzaprine, denying any adverse effects of the medication. (*Id.*) The results of Dr. Ahmed's cervical exam were the same as Ivanov's prior visit. (R. 659.) Dr. Ahmed's right-shoulder exam found that the range of motion was diminished with abduction and flexion to 165 to 180 degrees and that internal and external rotation was diminished to 70 to 90 degrees secondary to pain and tenderness. (R. 659-60.)

On March 13, 2017, Ivanov saw Dr. Wiener for another independent medical evaluation in connection with his workers' compensation claim. (R. 916-21.) Ivanov reported that he had received an additional series of viscosupplementation injections and was not participating in active therapy. (R. 917.) Ivanov also reported swelling and discomfort within his right knee, which he attempted to treat with a home exercise program and Advil on an as-needed basis. (*Id.*) Ivanov further reported pain and instability in his left knee. (*Id.*) In his physical examination, Dr. Wiener noted that Ivanov's right knee continued to demonstrate significant venous stasis disease along the lower extremity with pitting edema. (*Id.*) Dr. Wiener also noted that the right-knee range of motion at flexion was 110 degrees and left-knee range of motion at flexion was 105 degrees. (R. 918.) Both knees had mild tenderness on palpation along the medial and lateral joint lines, with no evidence of laxity on stress testing of the knee in varus or valgus positions. (*Id.*) Dr. Weiner

---

11272144, at *5 n.10 (S.D.N.Y. Dec. 13, 2016), *report and recommendation adopted in part*, 2017 WL 1102671 (S.D.N.Y. Mar. 24, 2017) (citation omitted).

noted Ivanov's diagnoses as right-knee sprain with exacerbation of pre-existing internal derangement and pre-existing degenerative arthropathy status post-surgical intervention and left knee degenerative internal derangement status post-surgical intervention. (*Id.*) Dr. Wiener repeated his opinion that Ivanov had reached maximum medical improvement and noted that continued viscosupplementation injections were necessary but orthopedic treatment was not necessary. (R. 919.)

On May 19, 2017, Ivanov saw Dr. Pintauro for a routine physical examination. (R. 689.) Dr. Pintauro stressed to Ivanov diet and weight loss. (*Id*.)

Ivanov saw Dr. Rose for a follow-up visit on May 31, 2017. (R. 863-66.) Ivanov reported intermittent right-knee pain at level 8 out of 10 and intermittent left knee pain at level 10 out of 10. (R. 863.) Ivanov reported that the pain was exacerbated due to bending forward and prolonged sitting. (*Id*.) Ivanov's right-knee range of motion was 120 degrees at flexion and zero degrees at extension, and his left-knee range of motion was 110 degrees at flexion and zero degrees at extension. (R. 864.) A McMurray's test of the right knee was positive with diffuse joint pain, and the left knee was positive with medial and diffuse joint pain. (*Id*.) Dr. Rose found that Ivanov's condition was worsening. (R. 865.) Dr. Rose referred Ivanov for an MRI of the left knee; advised him to continue physical therapy; and indicated that he should not push, pull or lift. (*Id*.)

On June 2, 2017, Ivanov saw Dr. Haftel for a re-evaluation concerning his neck pain. (R. 661-63.) Ivanov explained that the reason for his long absence was due to issues with workers' compensation. (R. 661.) Ivanov reported headaches; constant, aching and sharp neck pain that radiates to his shoulders; stiffness in his neck; and numbness and tingling in his bilateral hands and fingers. (R. 661.) On average, Ivanov experienced level 4 out of 10 pain. (*Id*.) On cervical exam,

Dr. Haftel noted bilateral paracervical and trapezius tenderness and spasm, as well as tenderness over the lesser and greater occipital nerves and midline tenderness at C7. (R. 662.) A Spurling's test was positive. (*Id*.) In a right shoulder exam, Dr. Haftel found that the range of motion was diminished with abduction and flexion at 165 to 180 degrees and that internal and external rotation was diminished to 70 to 90 degrees secondary to pain and tenderness. (R. 663.) To treat Ivanov's muscle spasms, Dr. Haftel prescribed Naprelan and Cyclobenzaprine and advised Ivanov to avoid driving and operating machinery as the medication could cause impairment. (*Id*.) Dr. Haftel scheduled Ivanov to have an MRI of the cervical spine without contrast and to receive cervical trigger point injections. (*Id.*)

On June 26, 2017, Ivanov saw Dr. Wiener for another independent medical evaluation in connection with this workers' compensation claim. (R. 676-81, 923.) Ivanov reported pain, stiffness and difficulty with movement involving his knees. (R. 677, 924.) Ivanov also reported that he was currently receiving a series of viscosupplementation injections in his right knee, which was "slowly helping." (R. 677, 680, 924, 927.) In his physical examination, Dr. Wiener noted that Ivanov's right knee demonstrated significant venous stasis disease along the lower extremity with pitting edema distally in the extremity. (R. 925.) Dr. Wiener also noted that the right-knee range of motion at flexion was 100 degrees with mild tenderness on palpation along the medial and lateral joint lines and no evidence of laxity on stress testing of the knee in varus or valgus positions. (*Id*.) The left-knee range of motion, tenderness, and McMurray stress test yielded the same results as the right knee. (*Id*.) Dr. Weiner diagnosed Ivanov with right-knee sprain with exacerbation of pre-existing internal derangement and pre-existing degenerative arthropathy status post-surgical intervention and left-knee degenerative internal derangement status post-

surgical intervention. (*Id.*) Dr. Wiener found that Ivanov had not yet reached maximum medical improvement in his right knee and advised Ivanov to continue injections and participate in a home exercise program. (R. 679, 926.) Ultimately, Dr. Weiner found that Ivanov demonstrated a temporary partial disability at 50%. (*Id*.) Dr. Wiener did not recommend treatment for Ivanov's left knee because he found it was not caused by the injury that was the basis of his workers' compensation claim. (R. 926.)

On June 30, 2017, Ivanov saw Dr. Susan DiStasio, D.O. of Multi-Specialty Pain Management for trigger point injections and a follow-up visit. (R. 664-68.) On examination of the cervical spine, Dr. DiStasio noted diminished range of motion at flexion of 45 degrees to 60 degrees, extension of 40 to 50 degrees and rotation of 50 degrees to 80 degrees. (R. 667.) On examination of the right shoulder, Dr. DiStasio noted that Ivanov's range of motion was diminished with abduction and flexion to 160 to 180 degrees. (*Id.*) Dr. DiStasio advised Ivanov to continue to use the same methods of treatment and encouraged him to schedule an MRI of his cervical spine, noting that he still had not done so. (R. 668.)

On July 24, 2017, Ivanov saw Dr. Rose for a follow-up visit complaining of chronic pain and bilateral limitation in his knees and lumbosacral spine pain. (R. 867-70, 991-93.) Specifically, Ivanov reported constant right-knee pain at level 4 out of 10 and constant left-knee pain at level 7 out of 10. (R. 866-67, 991.) Ivanov reported that the pain was exacerbated due to motion and repetitive use. (R. 867.) Ivanov's range of motion for both his right and left knee was 110 degrees at flexion. (R. 864, 868.) Dr. Rose found that Ivanov's condition was unchanged, advised Ivanov to complete a home exercise program and requested an MRI of the left knee. (R. 869, 993.) Dr. Rose also reiterated that Ivanov should avoid pushing, pulling and lifting. (R. 869.)

On July 31, 2017, Ivanov met with Dr. DiStasio for a follow-up visit regarding his neck pain. (R. 669-71.) Ivanov denied any adverse side effects regarding the injections he was given at the previous sessions and reported 70%alleviation of pain. (R. 669.) Dr. DiStasio advised Ivanov to continue to use the same methods of treatment, adding that he should avoid strenuous activity and heavy lifting. (R. 671.) Dr. DiStasio also noted that Ivanov did not fit into the MRI machines and that he requested a CT of his cervical spine. (*Id.*)

On August 7, 2017, Ivanov had a CT of his cervical spine at Lenox Hill Radiology. (R. 182.) Diagnostic impressions indicated a straightening of the cervical curvature, possibly due to muscular spasm, and disc bulges at C4/5 and C5/6. (*Id*.) The lower cervical spine was limited due to artifacts from bilateral shoulders. (*Id*.)

On August 22, 2017, Ivanov underwent an MRI of his left knee performed by Dr. Eric Sax at Distinguished Diagnostic Imaging, P.C. (R. 1100-01.) The MRI revealed a posterior horn medial tear and proximal fibular collateral ligament intrasubstance tear or strain with chondromalacia and joint effusion. (*Id.*)

On August 30, 2017, Ivanov saw Dr. Ahmed at Multi-Specialty Pain Management for a follow-up appointment following the CT scan of his cervical spine. (R. 672-74.) He described headaches and neck pain in the form of an aching sensation, which was aggravated with head movement. (R. 672.) On average, Ivanov experienced level 3 out of 10 pain. (*Id*.) Ivanov stated that he managed his pain with Advil, Naprosyn and Cyclobenzaprine. (*Id*.) On cervical exam, Dr. Ahmed noted bilateral paracervical and trapezius tenderness and spasm, tenderness over the lesser and greater occipital nerves and midline tenderness at C7. (*Id.*) A Spurling's test was positive. (*Id*.) Dr. Ahmed's right-shoulder exam found that the range of motion was diminished

with abduction and flexion at 160 to 180 degrees and with internal and external rotation at 70 to 90 degrees secondary to pain and tenderness. (*Id*.) To treat Ivanov's muscle spasms, Dr. Ahmed prescribed Naprelan and Cyclobenzaprine and advised Ivanov to avoid driving and operating machinery, as the medication could cause impairment. (R. 674.) Dr. Ahmed also requested authorization for trial cervical epidural steroid injections with epidurograms and recommended cervical trigger point injections. (*Id.*)

On September 18, 2017, Dr. Arjun Saxena, M.D. prepared a physician advisor report regarding authorization for a left-knee arthroscopy. (R. 682-84.) Dr. Saxena reviewed Ivanov's records, noting that he had left-knee pain with mechanical symptoms but that the MRI from August 27, 2017 revealed only a medial meniscus tear and no lateral meniscus pathology to correlate with the clinical findings. (R. 682, 684.) Dr. Saxena concluded that immediate surgery was not justified. (*Id.*)

On October 23, 2017, Ivanov saw Dr. Rose for a follow-up visit, reporting constant left-knee pain at level 7 out of 10. (R. 995-97.) Ivanov's left-knee range of motion remained 110 degrees at flexion and zero degrees at extension, since his last visit with Dr. Rose on July 24, 2017. (R. 868, 996.) Dr. Rose found that Ivanov's condition was unchanged and that he was waiting authorization for a left-knee arthroscopy. (R. 996.) During his next visit with Dr. Rose, on November 3, 2017, Ivanov reported that his left-knee symptoms were worsening and that he had constant left-knee pain at level 8 to 10 out of 10. (R. 994, 999.) Ivanov's range of motion decreased from his previous visit from 110 degrees to 100 degrees at flexion and zero degrees to negative five degrees at extension. (R. 996, 1000.) Dr. Rose noted that Ivanov walked with an antalgic gait, affecting the left lower extremity. (R. 1002.) Dr. Rose found that Ivanov's condition

was worsening and advised Ivanov to wear a knee immobilizer and complete physical therapy three times a week. (R. 1001.)

On December 15, 2017, Ivanov saw Dr. Rose for another follow-up visit. (R. 1004.) Ivanov reported intermittent left-knee pain at level 7, which decreased from a level 8-10 at his last left-knee visit on November 3, 2017. (R. 999, 1004.) Ivanov's range of motion increased from his last visit to this visit from 100 degrees to 110 degrees at flexion and negative five degrees to zero degrees at extension. (R. 1000, 1005.) Dr. Rose found that Ivanov's condition was unchanged and advised Ivanov to complete physical therapy three times a week. (R. 1006.)

During a follow-up visit the following month, on January 26, 2018, Ivanov reported that his symptoms were worsening and that he had intermittent left-knee pain at level 7-9. (R. 1008.) Ivanov's left knee range of motion at flexion decreased to 90 degrees. (R. 1005, 1009.) His left-knee extension remained at zero degrees. (*Id*.) Dr. Rose found that Ivanov's condition was unchanged but reported that Ivanov received authorization for a left-knee arthroscopy. (R. 1010.)

On March 12, 2018, Ivanov saw Dr. Rose for a follow-up visit and reported that his left-knee pain had decreased to a level 6. (R. 1008, 1012.) Ivanov's left-knee range of motion at flexion remained the same since his last visit at 90 degrees. (R. 1009, 1013.) His left-knee extension remained at zero degrees. (*Id*.) Dr. Rose found that Ivanov's condition was unchanged, but he noted that conservative treatment has not provided the patient relief. (R. 1014.)

Ivanov saw Dr. Rose again a few weeks later, on March 30, 2018. (R. 1016-19.)  Ivanov reported that his right-knee pain level was 5 out of 10 and his home exercise program only helped slightly. (R. 1016.) Ivanov's right-knee range of motion at flexion decreased from 120 degrees at his July 24, 2017 right-knee visit to 110 degrees at this visit. (R. 868, 1017.) His right-knee

extension remained at zero degrees. (*Id*.) Dr. Rose found that Ivanov's right-knee condition was worsening, noting that Ivanov's symptoms worsen with, *inter alia*, kneeling. (R. 1016, 1018.) Dr. Rose also advised Ivanov to complete physical therapy three times a week. (R. 1018.)

On April 23, 2018, Ivanov reported that his intermittent left-knee pain remained at level 6. (R. 1020.) Ivanov's range of motion at flexion increased from 90 degrees at his last left-knee visit to 100 degrees at this visit. (R. 1013, 1021.) His left-knee extension remained at zero degrees. (*Id*.) Dr. Rose found that Ivanov's condition was unchanged and advised Ivanov to enroll in a weight loss program and home exercise program. (R. 1022.) Dr. Rose also requested authorization from workers' compensation for a left-knee arthroscopy. (*Id*.)

On May 11, 2018, Ivanov reported constant right-knee pain at level 7 out of 10, which increased from a level 5 at his last right-knee visit on March 30, 2018. (R. 1016, 1024-26.) Ivanov's right-knee range of motion at flexion at 110 degrees remained the same as his last right-knee visit. (R. 1017, 1025.) His right-knee extension remained at zero degrees. (*Id*.) Dr. Rose found that Ivanov's condition was unchanged and continued to advise Ivanov to enroll in a weight loss program. (R. 1026.)

On June 4, 2018, Ivanov reported intermittent left-knee pain, which increased from a level 6 out of 10 at his last left-knee visit on April 23, 2018 to a level 8 to 10 at this visit. (R. 1020, 1029.) Ivanov's left-knee range of motion at flexion at 100 degrees remained the same as his last left-knee visit. (R. 1021, 1030.) His left-knee extension remained at zero degrees. (*Id*.) Dr. Rose found that Ivanov's symptoms were unchanged. (R. 1029-1030.)

On June 22, 2018, Ivanov reported that his constant right-knee pain remained at level 7 out of 10. (R. 1024-26, 1032.) Ivanov's right-knee range of motion at flexion at 110 degrees also

remained the same, but Dr. Rose noted pain with stiffness during this visit. (R. 1025, 1033.) Ivanov's right-knee extension remained at zero degrees. (*Id*.) Dr. Rose found that Ivanov's symptoms were unchanged and continued to advise Ivanov to enroll in a weight loss program. (R. 1032-34.)

On June 27, 2018, Ivanov saw Dr. Pintauro for his annual physical exam. (R. 952, 956.) Dr. Pintauro diagnosed Ivanov with, among other things, diabetes mellitus, type II, hyperglycemia and diabetic polyneuropathy, meniscus tears in both knees, bilateral carpal tunnel syndrome, bilateral osteoarthritis of the knees and cervical disc disorder with myelopathy. (R. 953, 956.) Dr. Pintauro also noted that Ivanov needed a Performance Oriented Mobility assessment for his left knee meniscectomy and that Ivanov had been noncompliant with his medications other than Metformin. (R. 956.) Dr. Pintauro then renewed Ivanov's medication; ordered a chest X-Ray and bloodwork; and noted that he would check Ivanov's blood pressure the following week, once Ivanov was on the medication. (*Id*.)

Ivanov saw Dr. Rose for another follow-up appointment on July 16, 2018, and reported that his symptoms were worsening. (R. 1036.) Specifically, he reported constant left-knee pain at level 8 out of 10, instead of intermittent pain at a level 8 to 10 during his last left-knee visit with Dr. Rose on June 4, 2018. (R. 1029, 1036.) Ivanov's left-knee range of motion at flexion remained at 100 degrees. (R. 1030, 1037.) His left-knee extension remained at zero degrees. (*Id*.) Dr. Rose found that Ivanov's symptoms were unchanged and noted that Ivanov should return for a left-knee follow-up visit after his left-knee arthroscopy. (R. 1038.)

The following month, on August 3, 2018, Ivanov reported to Dr. Rose that he was experiencing constant right-knee pain between levels 6 to 7 out of 10. (R. 1032, 1039.) Ivanov's

right-knee range of motion at flexion remained at 110 degrees, and Dr. Rose still noted pain with stiffness. (R. 1033, 1040.) His right-knee extension remained at zero degrees. (*Id*.) Dr. Rose noted that Ivanov's symptoms were unchanged and that Ivanov may eventually benefit from a right-knee arthroplasty.[18] (R. 1040.) Dr. Rose advised Ivanov to continue his home exercises and enroll in a weight loss program. (*Id*.)

On September 7, 2018, Ivanov saw Dr. Pintauro for a preoperative medical assessment prior to his left-knee meniscectomy, noting that Ivanov would need a total replacement of the right knee following the left-knee meniscectomy. (R. 958, 961.) At the end of the visit, Dr. Pintauro ordered bloodwork; increased the dosage of one of Ivanov's blood pressure medications, Labetalol; directed Ivanov to take two of his other blood pressure medications, Amlodipine and Benicar, every morning instead of daily at any time; noted that Ivanov should return the following week to have his blood pressure rechecked; and noted to increase the dosage of Ivanov's antidiabetic medication in two weeks. (*Id*.)

Later that month, on September 21, 2018, Ivanov saw Dr. Rose for a follow-up appointment. (R. 1043.) Ivanov reported that his constant right-knee pain remained at level 6 to 7 out of 10. (R. 1039, 1043.) Ivanov's right-knee range of motion at flexion remained at 110 degrees, and Dr. Rose still noted pain with stiffness. (R. 1040, 1044.) His right-knee extension remained at zero degrees. (*Id*.) Dr. Rose found that Ivanov's condition was worsening, continued to advised Ivanov to enroll in a weight loss program and discussed future options including a total knee replacement.[19] (R. 1044-45.)

---

[18] Arthroplasty is "plastic surgery of a joint or of joints; the formation of movable joints." *Dorland's Illustrated Medical Dictionary* 155 (33d ed. 2020)

[19] Ivanov eventually underwent a total knee replacement of his right knee in November 2019. (R. 176-78.)

On October 11, 2018, Dr. Rose conducted an arthroscopic medial and lateral meniscectomy, synovectomy, arthroscopic removal of loose body and chondroplasty of the medial femoral condyle on Ivanov's left knee. (R. 1104-05.) Dr. Rose's postoperative diagnosis indicated other tears of the medial and lateral meniscus, synovitis, tenosynovitis of the left lower leg, left-knee loose body and left-knee chondromalacia. (*Id.*) During a follow-up visit the following week, on October 17, 2018, Ivanov reported that his left-knee pain reduced from a level 8 to a level 6 out of 10. (R. 1036, 1047.) Dr. Rose noted that Ivanov's strength was 3/5. (R. 1037, 1048.) Dr. Rose found that Ivanov's condition was "fair" post-operation and that his surgical wounds were healing. (R. 1048-49.) Dr. Rose continued to advised Ivanov to enroll in a weight loss program. (R. 1048-49.)

On October 24, 2018, Ivanov saw Dr. Rose for another follow-up visit. Ivanov reported that his left-knee symptoms were improving, with only intermittent pain at a level 5 out of 10. (R. 1047, 1052.) Ivanov's left-knee range of motion at flexion remained at 100 degrees. (R. 1037, 1053.) His left-knee extension remained at zero degrees. (*Id*.) Dr. Rose noted that Ivanov's condition was improving and prescribed physical therapy 2 to 3 times a week. (R. 1054.)

On October 29, 2018, Ivanov saw Dr. Haftel for a follow-up visit following Ivanov's left-knee surgery. (R. 935-37.) Ivanov reported that his left-knee pain increased from a level 5 at his last left-knee visit with Dr. Rose to a level 6 at this visit with Dr. Haftel. (R. 935, 1052.) Further, Ivanov experienced constant aching and occasionally sharp pain compared to the intermittent pain he reported at his last visit. (*Id*.) Upon examination of Ivanov's left knee, Dr. Haftel noted that Ivanov's left-knee range of motion at flexion was between 120 and 130 degrees, increasing

from 100 degrees during his last left-knee visit. (R. 936, 1053.) His left-knee extension remained at zero degrees. (*Id*.)

Ivanov saw Dr. Rose again on November 16, 2018. (R. 1057.) Ivanov reported that his constant right-knee pain increased from a level 6 to 7 out of 10 at his last right-knee visit to a level 7 at this visit. (R. 1043, 1057.) Ivanov's right-knee range of motion at flexion remained at 110 degrees, and Dr. Rose still noted pain with stiffness. (R. 1044, 1058.) His right-knee extension remained at zero degrees. (*Id*.) Dr. Rose found that Ivanov's condition was unchanged and prescribed physical therapy 2 to 3 times a week. (R. 1058-59.)

Ivanov had a follow-up visit with Dr. Haftel at Multi-Specialty Pain Management on November 26, 2018, regarding his left knee. (R. 938-40.) Ivanov reported that his constant left-knee pain increased from a level 6 out of 10 at his last left-knee visit to a level 6 to 7 at this visit. (R. 935, 938.) Upon examination of Ivanov's left knee, Dr. Haftel noted that Ivanov's left-knee range of motion at flexion remained between 120 and 130 degrees. (R. 936, 939.) His left-knee extension remained at zero degrees. (*Id*.)

On December 4, 2018, Ivanov reported to Dr. Rose that his pain decreased from a level 6 to 7 out of 10 to a level 6. (R. 938, 1060.) Ivanov also noted that he only experienced intermittent pain compared to the constant pain he reported at his last visit. (*Id*.) Upon examination of Ivanov's left knee, Dr. Rose noted that Ivanov's left-knee range of motion at flexion was 100 degrees, decreasing from between 120 and 130 degrees at flexion during his last left-knee visit. (R. 939, 1061.) His left-knee extension remained at zero degrees. (*Id*.) Dr. Rose found that Ivanov's condition was unchanged and prescribed physical therapy 3 times a week. (R. 1062.)

Ivanov had a follow-up visit with Dr. DiStasio at Multi-Specialty Pain Management on December 24, 2018. (R. 941.) Ivanov reported that his constant left-knee pain increased from a level 6 out of 10 at his last left-knee visit with Dr. Rose to a level 7 at this visit. (R. 941, 1060.) Upon examination of Ivanov's left knee, Dr. DiStasio noted that Ivanov's left-knee range of motion at flexion was between 120 and 130 degrees, increasing from 100 degrees at flexion during his last left-knee visit. (R. 942, 1061.) His left-knee extension remained at zero degrees. (*Id*.) On December 28, 2018, Ivanov reported that his right knee pain was worsening, noting that his pain increased from a level 7 out of 10 to between a 7 and 8 since his last right-knee visit on November 16, 2018. (R. 1057, 1063.) Ivanov's right-knee range of motion at flexion remained at 110 degrees, and Dr. Rose still noted pain with stiffness. (R. 1058, 1064.) His right-knee extension remained at zero degrees. (*Id*.) Dr. Rose found that Ivanov's condition was unchanged and advised Ivanov to continue physical therapy 2 to 3 times a week. (R. 1065.)

### E.   October 10, 2019 Dr. Dipti Joshi, M.D., Consultative Examiner

On October 10, 2019, Ivanov saw Dipti Joshi, M.D. for an internal medicine consultative examination. (R. 1119-24.) Ivanov reported a multiple-year history of bilateral carpal tunnel syndrome, as well as neck pain, hip pain, bilateral knee pain and pain in his left foot. (R. 1119.) On physical examination, Dr. Joshi measured a blood pressure of 140/100. (R. 1121.) Dr. Joshi noted that Ivanov could walk on his heels and toes without difficulty, needed no help changing for the exam, rose from a chair without difficulty, appeared to be in no acute distress and had a normal stance. (*Id*.) Dr. Joshi noted that Ivanov used knee braces at all times, used a cane mostly when outdoors, squatted approximately 10% and had difficulty lying flat. (*Id*.)

Dr. Joshi opined that Ivanov had moderate limitations in bending and marked limitations in squatting, heavy lifting, carrying, pushing, pulling, prolonged walking, climbing and standing. (R. 1123.) Dr. Joshi cautioned Ivanov to avoid the repetitive activities with his hands and neck and to avoid working from heights. (*Id*.) Dr. Joshi also advised Ivanov to seek immediate treatment due to high blood pressure. (R. 1125.)

Following the examination, Dr. Joshi completed a Medical Source Statement. (R. 1126-31.) In the statement, Dr. Joshi found that Ivanov could frequently lift and carry up to 10 pounds, occasionally lift and carry up to 20 pounds and never lift and carry above 20 pounds. (R. 1126.) Dr. Joshi also found that Ivanov could sit for 30 minutes without interruption and for 6 hours in an 8-hour workday, could stand for up to 20 minutes without interruption and for 1 hour in an 8-hour workday and could walk for up to 15 minutes without interruption and for 1 hour in an 8-hour workday. (R. 1127.) Further, Ivanov could walk up to 20 feet without a cane and could carry small objects in his free hand when using his cane. (*Id*.)

Regarding the use of both of Ivanov's hands, Dr. Joshi noted that Ivanov could frequently reach, handle, finger and feel and could occasionally push and pull. (R. 1128.) Ivanov could also frequently operate foot controls with both of his feet. (*Id*.) In terms of postural limitations, Dr. Joshi found that Ivanov could never crawl or climb stairs, ramps, ladders or scaffolds and could occasionally balance, stoop, kneel and crouch. (R. 1129.)

As to environmental limitations, Ivanov could never tolerate unprotected heights, extreme cold and extreme heat and could occasionally tolerate vibrations; moving mechanical

parts; operating a motor vehicle; humidity and wetness; and dust, odors, fumes and pulmonary irritants. (R. 1130.)

Despite Ivanov's physical impairments, Dr. Joshi found that Ivanov could perform all of the following activities: shopping; traveling without a companion; walking without the assistance of more than a single cane; walking on rough or uneven surfaces; using standard public transportation; climbing a few steps with a single handrail; preparing a simple meal; feeding himself; caring for his personal hygiene; and sorting, handling or using paper. (R. 1131.)

IV.     **The October 30, 2017 Administrative Hearing Testimony**

At the administrative hearing before ALJ Neugebauer on October 30, 2017, Ivanov testified that he had limited ability to bend and trouble carrying anything while using the stairs but was able to lift up to 20 pounds from a seated position and was able to dress himself by sitting on the bed. (R. 195-98.) He further testified that he was able to drive to his children's school, the store and the supermarket. (R. 198-99.) To clean, Ivanov testified that he used tongs to move clothes from the floor to the hamper and brought dishes to the sink. (R. 199-200.)

Ivanov also testified that it hurt when he moved his head and neck up and down when he was looking at papers or a computer screen, but he could look forward or down to watch television. (R. 190, 203.) He testified that he had limited motion on the left side of his neck but had more mobility on the right side of his neck. (R. 191.) Ivanov also testified that he experienced pain that radiated from his right shoulder to his neck when he raised his arms too high, but he could extend his arms straight out for 30 seconds. (R. 208.) He testified that the neck pain was a result of a work-related incident where he was hit in the head, causing four to five bulging disks in his neck. (R. 190.) To treat the neck pain, he received trigger point injections, which alleviated

his pain for approximately a week. (R. 210.) Ivanov treated his neck pain at home with a TENs unit. (R. 204.)

Ivanov further testified that his hands got fatigued if he tried to write for 30 minutes to an hour, causing pens to fall out of his hands and hand spasms, which he attributed to carpal tunnel. (R. 191, 197, 206-07.) He treated his hand pain at home by sleeping in compression gloves every night, which helped alleviate the pain. (R. 205-06.) Regarding his knee pain, Ivanov testified that he experienced knee pain and swelling, which prevented him from walking for more than 30 minutes, prevented him from standing for extended periods of time and required him to stretch after sitting for more than 20 minutes. (R. 193-95, 202.) His knees buckled after extended use but had not caused him to fall from buckling for a year. (R. 206.) As a result of the knee pain and swelling, Ivanov kept his legs elevated for most of the day. (R. 201.) Ivanov treated his knee pain at home with a TENs unit, biofreeze, neoprene compression sleeves and a knee brace. (R. 204-05.) In addition, Ivanov took Advil, Naproxen and Cyclobenzaprine on a regular basis. (R. 193.)

Ivanov testified that he no longer could work a full-time job because he was unable sit for that long without experiencing stiffness in his knees and legs and swelling in his legs, ankles and feet. (R. 189-90.) He testified that he would need to "stand up" and "move around" but that, even then, his legs were "slow to break . . . in." (R. 189.)

**V.     The September 6, 2019 Administrative Hearing**

At the administrative hearing before ALJ Levine on September 6, 2019, Ivanov testified that he was able to shower on his own, but he used a "suction cup arm" for stability when stepping in and out of the shower because he previously had fallen while exiting the shower. (R. 233.) He also testified that he was able to dress on his own but that he needed to sit down when

dressing himself. (R. 232-33.) Ivanov did light vacuuming and washed the dishes. (R. 233, 239.) His wife shopped for him and did his laundry, but he helped her cook by cutting ingredients at the table. (R. 239.) Ivanov had trouble carrying anything while using the stairs but stated that he was able to lift up to 30 pounds from a seated position. (R. 234.) While Ivanov reportedly had trouble bending over and used "grabbers" to grab things off of the floor, he testified that he was able to bend forward and touch his knees. (R. 235.)

Ivanov further testified that he drove to his doctor, physical therapist, children's school and friend's house. (R. 232, 241.) He stated that he could drive up to two hours, but he would be "shot for the day" following such an extended drive. (R. 231-32.) Ivanov testified that he saw his friends "every now and then" but spent most of his day watching television. (R. 238.) Otherwise, he spent his time reading, listening to music, lying in bed, performing his leg exercises and paying bills at his computer. (R. 239-40.)

Ivanov stated that he experienced pain that radiated from his right shoulder to his neck, which was a result of a work-related incident where he was hit in the head, causing five bulging disks and pinched nerves in his neck. (R. 236.) He further testified that his neck started bothering him if he sat at a desk for a long time. (R. 242.)

Ivanov testified that he could use a doorknob, but his hands were tight and tingled. (R. 236-37.) At times, his hand cramped, and he had to press it down on a hard surface to open it up. (R. 237.) Ivanov testified that he treated his hand pain at home by using arthritis gloves. (R. 237.)

Ivanov testified regarding his injuries to both of his knees. (R. 225.) He further testified that his knee injuries prevented him from walking more than a block without resting and that he had ankle problems that contributed to his inability to walk. (R. 230.) When he walked for longer

distances, he used a cane. (R. 228.) Ivanov's doctors told him to wear a knee brace if he did any "heavy walking." (*Id*.) He testified that he has climbed the fourteen steps to his second-floor apartment one by one and held onto the rail. (R. 234-35.) Ivanov further testified that his knee injuries prevented him from standing for more than an hour. (R. 233-234.) Regarding his left knee, his doctor reportedly told him that he has "the knee of a 90 year old." (R. 241.)

Ivanov also testified that, after sitting for more than an hour, he had to stand up or lie down. (R. 231, 233-34.) Following an extended period of sitting, his knees "lock[ed] in place" and "moving them [was] slow." (R. 231.) Ivanov was unable use his knees to arise from a seated position on the floor and instead pushed or crawled up from his position on the floor. (R. 235-36.)

Ivanov testified that he attended physical therapy one to two times per week and also treated his knee pain at home with compression sleeves. (R. 228.) Ivanov testified that he no longer could work as a stagehand because it required carrying large pieces of scenery, navigating 14-inch steps and walking "extremely fast." (R. 227-28.)

## VI.   October 30, 2019 Vocational Expert Interrogatories

On October 21, 2019, ALJ Levine sent a letter requesting a vocational expert's professional opinion in connection with Ivanov's Social Security disability claim, enclosing vocational interrogatories. (R. 545.) On October 30, 2019, Vocational Expert ("VE") Yaakov Taitz, Ph.D. completed the interrogatories. (R. 549.) VE Taitz noted that Ivanov had past relevant work as a stage technician, which required heavy strength (Dictionary of Occupational Titles ("DOT") #962.261-014). (R. 546-47.)  VE Taitz concluded that Ivanov's RFC limited Ivanov to sedentary work, so he was no longer able to perform work as a stage technician. (R. 547.) VE Taitz found

that Ivanov could perform several unskilled occupations that exist in the national economy, including document preparer (DOT #249.587-018), telephone information clerk (DOT #237.367-046) and addresser (DOT #209.587-010).

**VII.**   **ALJ Levine's Decision And Appeals Council Review**

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, ALJ Levine found at step one that Ivanov had not engaged in substantial gainful activity since December 24, 2014, the alleged onset date. (R. 159.) At step two, the ALJ determined that Ivanov had the following severe impairments: morbid obesity, with hip pain; bilateral knee internal derangement and tear of the lateral meniscus; diabetes; hyperlipidemia; headaches; hypertension; bulging discs of the cervical spine; and bilateral carpal tunnel syndrome. (*Id*.)

At step three, the ALJ found that Ivanov did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 159.) The ALJ stated that he gave specific consideration to Listings 1.00, 4.00, 9.00, 11.00 and 1.02. (*Id.*) The ALJ discussed the relevant provisions of Social Security Ruling ("SSR") 12-2p to assess Ivanov's morbid obesity and the relevant provisions of SSR 19-4p to assess Ivanov's headaches.

The ALJ specifically discussed Listing 1.02, finding Ivanov's impairments were "not characterized by gross anatomical deformity and chronic joint pain and stiffness, with signs of limitation of motion or other abnormal motion of the affected joints, and findings on appropriate medically acceptable imaging of joint space narrowing, bony deconstruction or ankylosis of the affected joint(s)." (R. 159.) The ALJ further discussed 1.00(B)(2)(b), finding that the record did not show involvement of one major peripheral weight-bearing joint, resulting in inability to ambulate

effectively. (*Id*.) The ALJ then addressed 1.00(B)(2)(c), finding that the record did not show involvement of one major peripheral joint in each upper extremity, resulting in inability to perform fine and gross movements effectively. (*Id*.)

The ALJ then assessed Ivanov's RFC and determined that Ivanov was able to perform sedentary work,[20] except that he could lift/carry up to twenty pounds occasionally; occasionally operate foot controls, push/pull, climb ramp/stairs, balance, stoop and kneel; could never climb ladders, ropes, or scaffolds, crouch or crawl; could have occasional exposure to extreme cold/heat, wetness/humidity and environmental irritants (*i.e*., fumes, odors, gases and dusts); and needed to avoid all use of hazardous machinery and all exposure to unprotected heights. (R. 160.)

At step four, the ALJ found that Ivanov was unable to perform any past relevant work. (R. 167.) At step five, the ALJ considered Ivanov's age, education, work experience and RFC and concluded that there were jobs existing in significant numbers in the national economy that Ivanov could have performed, including document preparer (DOT #249.578-018), telephone information clerk (DOT #237.367-046) and addresser (DOT #209.587-010). (R. 167-168.) Therefore, the ALJ found that Ivanov was not disabled between the alleged onset date and his DLI and denied his claim for benefits. (R. 169.) Following the ALJ's decision, Ivanov sought review from the Appeals Council, which denied his request on May 6, 2021. (R. 1-7.)

---

[20] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id*. "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id*.

**LEGAL STANDARDS**

**I.      Standard Of Review**

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am., Local 537*, 47 F.3d 14, 16 (2d Cir. 1994) (citing Fed. R. Civ. P. 12(c)). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009); *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"
*Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389,
401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of
review—even more so than the clearly erroneous standard, and the Commissioner's findings of
fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v.
Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order)
(emphasis in original) (citation and internal quotation marks omitted). If the findings of the
Commissioner as to any fact are supported by substantial evidence, those findings are conclusive.
*Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.    Determination Of Disability

A person is considered disabled for benefits purposes when she is unable "to engage in
any substantial gainful activity by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has lasted or can be expected to
last for a continuous period of not less than 12 months . . .." 42 U.S.C. §§ 423(d)(1)(A),
1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for him, or whether
> he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider:
"(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts;

(3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 404.1520(a)(4).

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R.

36

§ 404.1520(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999) (citation omitted). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 50-51.

### III.   The Treating Physician Rule[21]

An ALJ must follow specific procedures "in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). First, the ALJ must decide whether a treating physician's opinion is entitled to controlling weight. *See id*. The ALJ must give "controlling weight" to the opinion of a claimant's treating physician as to the nature and severity of the impairment as long as it "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Halloran*, 362 F.3d at 32 ("[T]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not

---

[21] On January 18, 2017, the SSA promulgated a final rule that dramatically changed the nature of the evaluation of medical opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence, 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017) (codified at 20 C.F.R. § 404.1520c). These new regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Plaintiff's claim was filed before that date, to the extent that the regulations regarding medical opinion evidence are cited in this Opinion and Order, the Court is referring to the version of the regulations effective before March 27, 2017. *See Deloatch v. Acting Comm'r of Soc. Sec.*, 582 F. Supp. 3d 100, 107 n.2 (S.D.N.Y. 2022).

consistent with other substantial evidence in the record, [including] the opinions of other medical experts.").

If the ALJ decides the treating physician's opinion is not entitled to controlling weight, the ALJ must determine how much weight, if any, to give it. *Estrella*, 925 F.3d at 95. "Even if the treating physician's opinion is contradicted by other substantial evidence, and so is not controlling, it may still be entitled to significant weight 'because the treating source is inherently more familiar with a claimant's medical condition than are other sources.'" *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (quoting *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir. 1988)). In deciding what weight to assign, the ALJ must "explicitly consider" the following, nonexclusive factors: "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (citing *Burgess*, 537 F.3d at 129) (additional citations omitted).

At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." *Halloran*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Zabala*, 595 F.3d at 409 ("The ALJ was required either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting them."). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96 (citing *Selian v. Astrue*, 708 F.3d 409, 419-20 (2d Cir. 2013)). However, if "a searching review of the record" assures the Court "that the

substance of the treating physician rule was not traversed," the Court should affirm. *Id.* (citing

*Halloran*, 362 F.3d at 32).

### DISCUSSION

Plaintiff makes various arguments in support of remand. (Pl.'s Mem., ECF No. 9, at PDF

pp. 15-25.) His lead argument relates to the ALJ's evaluation of medical opinion evidence, and

that argument is addressed below.

### I.   The ALJ's Evaluation Of The Medical Opinion Evidence

Plaintiff argues that the ALJ improperly evaluated the opinions of his orthopedic surgeon,

Dr. Rose, and the internal medicine consultative examiner, Dr. Joshi. (Pl.'s Mem. at PDF pp. 15-

17.)

The ALJ considered Dr. Rose's medical opinions in the treatment records indicating that

Ivanov should never kneel, squat or ambulate on uneven or slippery surfaces and his May 2017

treatment note indicating that Ivanov should never push, pull or lift.[22] (R. 165.) The ALJ accorded

these opinions "little weight" because they "were inconsistent with the clinical evidence, which

showed that the claimant was not as limited as opined." (*Id.*) Rather, the ALJ found that Ivanov

"experienced some improvement in his signs and symptoms through his surgical intervention and

viscosupplementation injections, and he otherwise required only conservative treatment, such

that he was capable of performing sedentary exertion level work, with additional limitations, as

outlined [in the RFC determination]." (*Id.*) However, the ALJ did not identify the clinical evidence

that he found inconsistent with Dr. Rose's opinions, nor did he cite the evidence he relied upon

---

[22] "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527.

in support of his conclusion that Ivanov experienced "some improvement" and was capable of sedentary work. This was error. "Under the treating physician rule, an ALJ may not reject a treating physician's opinion based solely on conclusory assertions of inconsistency with the medical record." *Arzu*, 2020 WL 9596205, at *17 (internal alterations omitted) (citing cases).

Moreover, even if the Court can glean, based on the ALJ's reference to viscosupplementation injections, that he relied, at least in part, on the treatment notes from Dr. Wiener,[23] those three treatment notes (from June 2016, March 2017 and June 2017) do not constitute substantial evidence that is inconsistent with Dr. Rose's opinion. Although Dr. Wiener noted that Ivanov had received viscosupplementation injections for pain management, which had provided 9-12 months of relief in the past, such treatment does not contradict Dr. Rose's opinion as to Ivanov's functional limitations. Notably, Dr. Wiener's last report in June 2017 noted that reevaluation by Ivanov's treating physician to determine the efficacy of the injections was warranted in two months. (R. 679.)

In any event, even if the ALJ was entitled to afford less than controlling weight to Dr. Rose's opinions, he was required to provide "good reasons" for the weight assigned. *Halloran*, 362 F.3d at 32. The ALJ's conclusory statement that Ivanov experienced "some improvement" from surgical intervention and viscosupplementation injections and otherwise required only "conservative treatment" is insufficient. (R. 165.) Although the record contains some treatment notes indicating some or slight improvement at various points during the relevant period, the record also includes many positive examination findings regarding Ivanov's knees, as well as numerous treatment notes indicating that Ivanov's knee conditions were worsening and frequent

---

[23] The Court notes that the ALJ misspelled Dr. Wiener's last name as "Weiner." (R. 164.)

reports that he had difficulty with kneeling or squatting in particular. (*See, e.g.*, R. 575-77 (July 2015 note from Dr. Rose stating that the right knee's lateral meniscal tear was worsening); 897-902 (December 2015 treatment note where Ivanov reported to Dr. Pick that he was "mostly" better but "not 100%" and also reporting pain worsened by climbing stairs, kneeling and rising from kneeling); 863-66 (May 2017 note from Dr. Rose stating that Ivanov's condition was worsening); 995-97 (November 2017 note from Dr. Rose finding that Ivanov's condition was worsening and advising Ivanov to wear a knee immobilizer and complete physical therapy three times a week); 1008-10 (January 2018 treatment note where Ivanov reported to Dr. Rose that his symptoms were worsening, including increased left knee pain but where Dr. Rose found Ivanov's condition was unchanged); 1016-18 (March 2018 note from Dr. Rose stating symptoms worsen with, *inter alia*, kneeling and finding right knee condition worsening); 1036-38 (July 2018 treatment note where Ivanov reported to Dr. Rose that his symptoms were worsening but where Dr. Rose found Ivanov's condition was unchanged); 1044 (September 2018 note from Dr. Rose noting right knee condition worsening and discussing future options including total knee replacement); 1063-65 (December 2018 treatment note where Ivanov reported to Dr. Rose that his symptoms were worsening, including increased right-knee pain but where Dr. Rose found Ivanov's condition was unchanged); *see also* Comm'r Mem., ECF No. 13, at 18 (describing clinical findings as "mixed").) The ALJ did not address this conflicting evidence in rejecting Dr. Rose's opinions.

While not required to reconcile every shred of conflicting medical evidence, the ALJ cannot "cherry-pick" evidence to discredit a treating physician's opinion.[24] *See Sanabria v. Comm'r of Soc. Sec.*, No. 20-CV-00906 (DF), 2022 WL 976874, at *26 (S.D.N.Y. Mar. 31, 2022). The Court also is mindful that "as a lay person," the ALJ is not "in a position to know whether the objective medical data supported the treating physician's opinion." *Ferguson v. Colvin*, No. 12-CV-00033 (MAT), 2014 WL 3894487, at *7 (W.D.N.Y. Aug. 8, 2014) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)). Further, even if Ivanov's treatment could fairly be characterized as conservative, which is questionable, "[t]he Second Circuit has cautioned against discounting the opinion of a treating physician merely because the physician recommended a conservative treatment regimen." *Cohen-Aikens v. Saul*, No. 19-CV-04443 (SDA), 2020 WL 3126172, at *12 (S.D.N.Y. June 13, 2020) (citing *Burgess*, 537 F.3d at 129).

The ALJ also gave Dr. Rose's opinions less weight because they were rendered as a temporary precaution to avoid injury, not a long-term functional limitation. (R. 165.) However, at least with respect to his opinion that Ivanov could never kneel or squat or ambulate on uneven or slippery surfaces, Dr. Rose consistently reiterated this opinion throughout the relevant time period. (*See, e.g.*, R. 573 (March 16, 2015 visit); 576 (July 7, 2015 visit); 578 (July 15, 2015 visit); 581 (July 22, 2015 visit); 584 (September 2, 2015 visit); 1001 (November 3, 2017); 1006 (December 15, 2017); 1010 (January 26, 2018 visit); 1014 (March 12, 2018 visit); 1018 (March 30, 2018 visit); 1022 (April 23, 2018 visit); 1026 (May 11, 2018 visit); 1031 (June 4, 2018 visit); 1034

---

[24] As an example of the ALJ's cherry-picking, the ALJ stated that "[t]he claimant . . . acknowledged to Dr. Pick that he was 'mostly' better when compared to when he started his right knee treatments." (R. 164 (citing Ex. B11F at R. 897).) However, the ALJ ignored Ivanov's statements to Dr. Pick on the same day that the pain in his right knee was 4 to 5 out of 10, even after taking pain medication, and that the pain was achy, sharp and nagging and was radiating to his kneecap. (R. 897.)

(June 22, 2018 visit); 1038 (July 16, 2018 visit); 1040 (August 3, 2018 visit); 1045 (September 21, 2018 visit); 1049 (October 11, 2018 visit); 1054 (October 24, 2018 visit); 1059 (November 16, 2018 visit); 1062 (December 4, 2018 visit).)[25]

Because the ALJ traversed the treating physician rule, this action is remanded.

## II.    <u>Plaintiff's Remaining Arguments</u>

Plaintiff makes numerous additional arguments, including that the ALJ erred in assessing Plaintiff's credibility and erred in his RFC determination. (Pl.'s Mem. at PDF pp. 17-25.) However, because the Court has determined that remand is necessary based on the ALJ's failure to comply with the treating physician rule, the Court declines to reach these issues. *Morales v. Colvin*, No. 13-CV-06844 (LGS) (DF), 2015 WL 13774790, at *23 (S.D.N.Y. Feb. 10, 2015) (court need not reach additional arguments regarding ALJ's factual determinations "given that the ALJ's analysis may change on these points upon remand"), *report and recommendation adopted*, 2015 WL 2137776 (S.D.N.Y. May 4, 2015).

---

[25] The Commissioner asserts that Plaintiff's argument overlooks the fact that the ALJ's RFC determination "largely accounted" for Dr. Rose's opinions. (Comm'r Mem. at 20.) However, the Court finds that there at least is a reasonable probability that the ALJ's decision would have been different if he had credited Dr. Rose's opinions that Ivanov could never kneel or squat or ambulate on uneven and slippery surfaces.

## CONCLUSION

For the reasons set forth above, the Plaintiff's motion (ECF No. 8) is GRANTED, the Commissioner's cross-motion (ECF No. 12) is DENIED and this action is remanded for further proceedings consistent with this Opinion and Order.

**SO ORDERED.**

Dated:        New York, New York
              March 25, 2023

_____
STEWART D. AARON
United States Magistrate Judge